# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

| | |
|---|---|
| Daniel Redford, | __ Civ. ____ (___)(___) |
| Plaintiff(s), | |
| | COMPLAINT |
| v. | |
| City of Charlotte, North Carolina, | |
| Defendant(s). | JURY TRIAL DEMANDED |

**COMES NOW PLAINTIFF** Officer Daniel Redford ("Plaintiff") by and through the undersigned attorney Brian K. Leonard, for his Complaint against DEFENDANT City of Charlotte ("Defendant"), alleges, on knowledge, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1. This is a civil action brought by Plaintiff Daniel Redford ("Plaintiff" or "Officer Redford") against Defendant City of Charlotte, North Carolina, ("Defendant" or "City") for violations of his First Amendment rights under the United States Constitution and the North Carolina Constitution. Plaintiff seeks redress under 42 U.S.C. § 1983 for retaliation against him for engaging in protected speech on matters of public concern, as well as claims under North Carolina law for wrongful discharge in violation of public policy and whistleblower protections.

2. Plaintiff(s) seek(s) compensatory damages, backpay, damages for emotional distress, declaratory, and injunctive relief, including but not limited to an order enjoining

Defendant from engaging in any further violation of Plaintiff's North Carolina and federal constitutional rights.

## JURISDICTION

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the laws of the United States, specifically 42 U.S.C. § 1983. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

## VENUE

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (b)(2) because the Defendant resides in this district and a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

5. Plaintiff Daniel Redford is a resident of Charlotte, North Carolina, and has been employed by the Charlotte-Mecklenburg Police Department ("CMPD") for 19 years. He also serves as the President of the local Fraternal Order of Police ("FOP").

6. Defendant City of Charlotte is a municipal corporation located in Mecklenburg County, North Carolina, and operates the CMPD.

### Well Established Law-First Amendment- Speech

7. It is the well-established law that the First Amendment to the Constitution of the United States, as applicable to the States by virtue of the Fourteenth Amendment to the Constitution of the United States, guarantees to Plaintiff notwithstanding their employment by a government body the right to comment as citizens on matters of public concern free from

unnecessary and unreasonable interference, retaliation, and prior restraint from their employee and agents of their employee.

8. The First Amendment, made applicable to the States by virtue of the Fourteenth Amendment, protects the right of every citizen to petition the government for redress of grievances.

9. It is the well-established law that "[w]hile a public employee does not have a constitutional right to his job," a public employer cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Edwards v. City of Goldsboro,* 178 F.3d 231,245 (4th Cir. N.C. 1999). (*quoting Connick v. Myers,* 461 U.S. 138, 142, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983)).

10. It has been the well-established law in the Fourth Circuit since at least *Ridpath v. Bd. Of Governors Marshall Univ.,* 447 F.3d 292, 319 (4th Cir. W. Va. 2006) that:

> Under our precedent "a public employer is prohibited from threatening to discharge a public employee in an effort to chill that employee's rights under the First Amendment." *Edwards v. City of Goldsboro,* 178 F.3d 231, 246 (4th Cir. 1999). *[Footnote in text:* As the Supreme Court has explained, 'the threat of dismissal from public employment is ... a potent means of inhibiting speech. Pickering v. Bd. of Educ., 391 U.S. 563, 574, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).] A chilling claim is essentially the derivative of a retaliation claim: if a public employer cannot fire, demote, or similarly punish a public employee for engaging in protected speech, the employer also cannot intimidate the employee into silence by threatening impermissible retribution.

11. It has been the well-established law in the Fourth Circuit since at least *Connick v. Myers*, 461 U.S. 138, 154 (1983) (quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563,569 (1968))…that "[b]ecause of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged.

3

12. As evident from *Connick v. Myers*, 461 U.S. 138, 154 (1983) and the great bulk of cases that came before it and after it on point, there was and is no bright-line rule excluding from the protection of the First Amendment "[n]egative comments on the internal operations of [the speaker's public body employer], or specific conduct of supervisors or peers that impacts the public's perception [of the public body]."

13. Further, a prohibition based upon generalized and unsubstantiated interests against disruption rather than actual interference of the office is a violation of the First Amendment. *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 356 (4th Cir. 2000).

14. Additionally, the employee's interest in commenting on matters of public concern outweighs the government's interest in efficiency unless the employee-speaker is an agency-head or is in a policy making position. *See McVey v. Stacy*. 157 F.3d 271, 278- 79 (4th Cir. 1998).

15. The foregoing well-established law was sufficiently clear by March 2025 that a reasonable official would have understood it.

16. The state of the law at the time gave City of Charlottes sufficient reason to know that their actions, complained of herein, were clearly wrong and unconstitutional.

17. The threshold determination focuses on whether the speech may be fairly characterized as constituting speech on a matter of public concern. *Rankin v. McPherson,* 483 U.S. 378 (1987).

18. Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community. *Kirby v. City Of Elizabeth City, North Carolina,* 388 F.3d 440 (2004).

19. Courts examine the content, form, and context of a given statement and must view statements as a single expression of speech to be considered in its entirety rather than dividing speech into discrete components. *Liverman v. City of Petersburg*, 844 F.3d 400 (2016).

20. The Fourth Circuit has identified several categories of police officer speech that constitute matters of public concern.

21. In *Liverman v. City of Petersburg*, with facts almost identical to those included herein, the court held that police officers' Facebook comments about department training and promotion practices constituted protected speech because they addressed risks posed by the Department's inexperienced supervisors and raised issues of public concern. *See Liverman v. City of Petersburg,* 844 F.3d 400 (2016).

22. The officers grounded their statements in specialized knowledge and expressed concern about the department's ability to carry out its vital public mission effectively, with one officer citing an FBI study and noting implications for officer safety and questions of liability. *See Liverman v. City of Petersburg,* 844 F.3d 400 (2016)

23. Off-duty activities with social or political implications also receive protection. In *Edwards v. City of Goldsboro*, the 4th Circuit held that a police officer's off-duty teaching

of concealed handgun safety courses was protected speech on a matter of public concern, *Edwards v. City of Goldsboro*, 178 F.3d 231 (1999).

24. Similarly, in *Berger v. Battaglia*, the court found that a police officer's off-duty entertainment performances in blackface constituted speech on a matter of public concern, even though the speech was presumably neutral as to any political or social views. *See Berger v. Battaglia*, 779 F.2d 992 (1985).

25. The Fourth Circuit has emphasized that it was clearly established in the law of this Circuit in March 2025 that an employee's speech about serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency, is protected. *Hunter v. Town of Mocksville, North Carolina*, 789 F.3d 389 (2015).

26. This protection extends particularly to situations where officers report or comment on police misconduct that could affect public safety or welfare.

## FACTUAL BACKGROUND

27. Officer Redford, in his capacity as President of the FOP, engaged in protected speech activities, including media interviews and social media posts, addressing matters of public concern such as the CMPD's response to a deadly shooting on April 29, 2024, and the reprimand of officers involved.

28. On May 28, 2024, Officer Redford responded to a media inquiry from Nate Morabito of WCNC-TV regarding officers logging off during the shooting, clarifying that it was not a large number, in his capacity as FOP President.

29. Officer Redford is a Charlotte-Mecklenburg Police ("CMPD") Officer and also serves as the local Fraternal Order of Police ("FOP") President, which is an employee organization operating in a union-like manner.

30. As a dedicated 19-year employee, throughout his tenure, Officer Redford acted in the best interests of the employer, ensuring compliance with all policies and procedures.

31. Officer Redford previously had "exceeds expectations" in his performance evaluations.

32. The FOP made statements on its official Facebook page, and as president, Officer Redford participated in several media interviews regarding actions by the CMPD.

33. Officer Redford began being subject to undue pressure, discrimination, and retaliation following his engagement in free speech activity protected by the First Amendment of the U.S. Constitution, and the Declaration of Rights, Freedom of Speech and Press Clause of the North Carolina Constitution to wit:

34. On or about April 29, 2024, Charlotte experienced a deadly shooting that left four law enforcement officers dead and several others wounded.

35. This made national news, and media outlets repeatedly contacted Plaintiff directly and the FOP for comment.

36. A couple of weeks after this shooting, the FOP learned that two CMPD officers had logged off their computers and defected to avoid assisting with this shooting.

37. Due to their defection, the FOP learned of two officers that CMPD had reprimanded and transferred, one from the Providence Division and a second from the Central Division.

38. On or about May 28, 2024, Nate Morabito ("Morabito") with WCNC-TV texted Officer Redford asking if the FOP had heard about "a large number of officers" that "logged off" during the shooting.

39. In his capacity as President of the FOP only, not speaking on behalf of the CMPD, Officer Redford replied that he only heard that it was not a large number.

40. Morabito received information from another source about the officers who logged off.

41. Morabito and Officer Redford, again through the FOP only, have worked on several stories in the past, which is how they came to know each other.

42. Morabito was working on a potential news story as he and his station believed officers logging off during this deadly shooting was newsworthy.

43. Officer Redford did not disclose any confidential information or information that violated CMPD's policies.

44. All information was obtained via Officer Redford's position with the FOP.

45. On or about July 23, 2024, Morabito published a story, which did not contain any comments by the FOP or Officer Redford, nor were they referenced in it.

46. On or about July 27, 2024, the FOP made a Facebook post, on the Lodge's official Facebook page.

47. The post spoke against CMPD's response to Morabito's request for comment and information.

48. The post was critical of Sandra Vastola ("Vastola"), the CMPD's Public Affairs Director.

49. At this time, the FOP knew that two officers had been reprimanded, and CMPD's dismissive response was the catalyst for this post.

50. On or about August 22, 2024, Morabito published a second story on this matter, confirming that two CMPD officers had been reprimanded, with one being suspended.

51. Officer Redford, again only in his capacity as the FOP President, participated in an interview, in which he never identified himself as a CMPD officer.

52. However, Morabito did use a photo of Officer Redford in uniform that he obtained from an internet search.

53. On or about October 30, 2024, Vastola filed a lawsuit ("the Vastola lawsuit") against Officer Redford and the FOP relating to the Facebook posts.

54. On or about November 16, 2024, Officer Redford was served with the Vastola lawsuit at his home via certified mail and later retained counsel.

55. On or about November 18, 2024, two days after Officer Redford was served with the Vastola lawsuit, Vastola filed an Internal Affairs ("IA") complaint with CMPD's IA Department for violations of departmental directives and rules of conduct.

56. The IA complaint essentially replicated the one she had filed in the Vastola lawsuit.

57. On or about December 23, 2024, Officer Redford received a phone call from Lieutenant Triola, his supervisor at that time, asking if he was working because IA wanted to speak with him.

58. However, Officer Redford was out on bereavement leave for the whole week.

59. On or about December 30, 2024, upon returning to work, Officer Redford was contacted by Sergeant Nabb with IA asking him to meet him to discuss a matter, where he was informed of Vastola's IA complaint against him.

60. Officer Redford was interviewed and returned to his assignment in the Transit Unit.

61. On or about January 22, 2025, Officer Redford filed a complaint with the City of Charlotte's Human Resources as the IA investigation violated his rights and was a conflict due to the pending Vastola lawsuit.

62. On or about February 6, 2025, Officer Redford was called in for a second IA interview, and on or about February 17, 2025, for a third and final interview.

63. On or about March 20, 2025, Officer Redford appeared before CMPD's IA disciplinary board and was suspended for 40-hours unpaid for violating CMPD's Social Media Policy, Media Relations Policy, and Unbecoming Conduct.

64. IA ruled that the Facebook ("FB")posts were a violation and that as the President of the FOP Officer Redford allowed them to be posted.

65. In sum, IA ruled that as a CMPD employee, Officer Redford was responsible even though his name was never published and all statements were made via the FOP's official Facebook page.

66. In addition to the FB posts, IA ruled Officer Redford violated the Media Relations Policy by not receiving permission to speak with the media.

67. Officer Redford was also suspended for another FOP Facebook post again on the FOP's official page that did not have his name associated with it which spoke out against a matter of public concern: the CMPD Chief's opposition to equipping officers with outer carrier vests - something officers were begging for.

68. On or about March 28, 2025, Officer Redford returned to work from unpaid suspension and was called to his Lieutenant and Captain's office, where he was informed that he was being transferred from his specialized unit in the Transit Unit back to patrol.

69. As a result, Plaintiff lost a city take-home vehicle, overtime opportunities, a Monday-Friday schedule with lots of flexibility, and a better work/life balance.

70. On or about April 1, 2025, the Vastola lawsuit was heard before Mecklenburg County Superior Court Judge Matt Osman and was dismissed with prejudice.

71. Upon information and belief, the Vastola lawsuit is now on appeal with the N.C. Court of Appeals.

72. The City's actions, including the disciplinary actions taken against Officer Redford violated Officer Redford's constitutional rights under the First Amendment of the United States Constitution and similar provisions of the North Carolina Constitution.

## COUNT ONE

## VIOLATION OF FIRST AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983

73. PLAINTIFF repeat(s) and reallege(s) paragraphs 1 through 72 hereof, as if fully set forth herein.

74. Defendant, acting under color of state law, retaliated against Plaintiff for engaging in protected speech on matters of public concern, in violation of the First Amendment to the United States Constitution.

75. Plaintiff's speech was a substantial or motivating factor in the adverse employment actions taken against him, including suspension and transfer.

76. As a result of Defendant's actions, Plaintiff has suffered damages, including lost wages, benefits, and emotional distress.

77. By reason of the foregoing, defendant is liable an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## COUNT TWO

## VIOLATION OF NORTH CAROLINA CONSTITUTION

78. PLAINTIFF repeats and realleges paragraphs 1 through 77 hereof, as if fully set forth herein.

79. Defendant's actions violated Plaintiff's rights under Article I, Section 14 of the North Carolina Constitution, which protects freedom of speech and press.

80. Plaintiff's speech addressed matters of public concern and was protected under the North Carolina Constitution.

81. As a result of Defendant's actions, Plaintiff has suffered damages, including lost wages, benefits, and emotional distress.

82. By reason of the foregoing, defendant is liable an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## COUNT THREE RETALIATION

83. Plaintiff repeats and realleges paragraphs 1 through 82 as if fully set forth herein.

84. Defendant's retaliatory actions against Plaintiff for engaging in protected speech contravene the public policy of North Carolina, as expressed in the state's constitution and statutes.

85. Plaintiff's termination from his specialized unit and the resulting loss of benefits were wrongful and in violation of public policy.

86. Plaintiff lacks an adequate remedy at law.

87. By reason of the foregoing, plaintiff(s) seek(s) immediate restoration to his previous specialized unit, as well as restoration of the benefits retroactive to the date of the removal by the Defendant.

**WHEREFORE, PLAINTIFF** requests judgment as follows:

A. Award Plaintiff compensatory damages for lost wages, benefits, and emotional distress;

B. Order Defendant to reinstate Plaintiff to his former position or a comparable position, or in lieu of reinstatement, award front pay;

C. Award Plaintiff punitive damages for Defendant's willful and malicious conduct;

D. Award Plaintiff reasonable attorneys' fees and costs incurred in this action;

E. Declare that the actions for Defendant violated Plaintiff's free speech rights under the U.S. and North Carolina Constitutions.

F. Enjoin Defendant from continuing to violate Plaintiff's free speech rights under the U.S. and North Carolina Constitutions.

G. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated: September 27, 2025

>Respectfully submitted,
>By: <u>Brian K. Leonard</u>
>N.C. State Bar No. 38308
>Brian K. Leonard, Esq., LL.M, M.P.S., USTCP
>B.K. Leonard Law Firm
>11010 Lake Grove Blvd., Unit 100-425
>Morrisville, NC 27560
>(984) 212-7737
>bleonard@civilrightsappellatelawyer.com
>Attorneys for Plaintiff Officer Daniel Redford.